Security Painting Company *v.* Commonwealth of Pennsylvania, Department of Transportation, Appellant.

508

Argued March 2, 1976, before President Judge BOW-MAN and Judges CRUMLISH, JR., WILKINSON, JR., MEN-CER, ROGERS and BLATT. Judge KRAMER did not participate.

*Arthur H. Marateck*, Assistant Attorney General, with him *Robert W. Cunliffe*, Deputy Attorney General, and *Robert P. Kane*, Attorney General, for appellant.

*Earl J. Melman*, with him *August W. Petroplus*, and *Melman, Gekas, Nicholas and Lieberman*, for appellee.

OPINION BY JUDGE MENCER, May 17, 1976:

This appeal by the Commonwealth of Pennsylvania, Department of Transportation (PennDOT) is from an award by the Board of Arbitration of Claims (Board) to Security Painting Company (Security) for alleged extra work performed by Security in the course of painting twelve bridges.

In March of 1971, Security, as the successful bidder, entered into two contracts with PennDOT for the painting of twelve bridges in Potter and Clearfield Counties

for the total consideration of $23,580. As a painting contractor, Security was required, by the terms of the contract, to first sandblast the metal surfaces on the bridges in order to properly prepare them for the application of paint. Security began its sandblasting operations and was soon informed by PennDOT inspectors that it would have to remove substantially all of the sound and adherent old paint from all of the surfaces. Prior to this development, Security had intended only to remove loose, excessively thick or inflexible paint from the structures. Security acceded to the inspectors' demands and allegedly incurred considerable expense, resulting in the expenditure of a sum of money on the bridges in excess of the bid price.

After completion of the projects, Security filed timely exceptions to PennDOT's final payment order and, on November 11, 1971, filed two complaints before the Board, seeking additional compensation in the amount of $49,703.58 for the alleged extra work. These complaints were consolidated and, on September 17, 1975, after two extensive hearings, the Board awarded Security damages in the amount of $30,255.45, together with interest. This appeal followed.

Our scope of review is limited, and we are generally obliged to affirm an order of the Board unless it is contrary to the law or unless the Board's findings of fact are not supported by substantial evidence in the record. *Penn-Jersey Contractors, Inc. v. General State Authority*, 12 Pa. Commonwealth Ct. 203, 315 A. 2d 920 (1974). Here, the Board has committed an error of law and we are therefore compelled to reverse.

The substantive issues before us involve the construction of the contractual provisions applicable to the facts as found by the Board. We initiate our analysis by reference to the basic contractual provisions concerning the extent of sandblasting work to be performed by Security. The contract provided as follows:

"Extent of Work

"The work on all bridges shall consist of the removal of all soil, cement spatter, drawing compounds, salts or other foreign matter prior to cleaning and *complete commercial blast cleaning (Method A) of all surfaces of the structures* including open steel mesh decking. Each structure shall be painted with one (1) full coat of Dull Red Primer (I.R.P.), one (1) full coat of Sandstone Paint (No. 8) and one (1) full finish coat of Antique Bronze Paint as specified in Section 1070.

"Cleaning of Surfaces

"Amending Section 1073.01(a), the contractor shall remove all debris or buildup of foreign materials on the tops of abutments and piers. Such materials shall be disposed of prior to performing any painting operations." (Emphasis added.)

The contract also provided:

"5. The contractor further covenants and warrants that he has read and is completely familiar with and understands thoroughly the General Conditions, Specifications of Commonwealth of Pennsylvania, Department of Transportation, Form 408 (and Form 409, if applicable) currently in effect, the Supplements, Special Provisions and/or Conditions, any other addenda or Requirements, contained in and governing the performance of this contract, whether attached hereto and made a part hereof, or incorporated herein by reference thereto."

Therefore, because the "Extent of Work" provision in the contract provided for complete blast cleaning pursuant to "Method A," we are compelled to turn to Form 409, which provides in part:

"(b) Method A—Commercial Blast Cleaning.[1]

1. For a partial description of some of the various blast cleaning methods which may be used to accomplish the requirements of this specification, reference to Steel Structures Painting Council Surface Preparation Specification: No. 6 Commercial Blast Cleaning (SSPC-SP6) is recommended.

"Surfaces of metal shall be cleaned by the use of abrasives propelled through nozzles or by centrifugal wheels. The method of propelling the abrasives and the type and size of abrasives used shall be such that all oil, grease, dirt, rust scale and foreign matter have been completely removed from the surface and *all rust, mill scale and old paint have been completely removed except for slight shadows, streaks, or discolorations cause by rust stain, mill scale oxides or slight, tight residues of paint or coating that may remain. At least two-thirds of each square inch of surface area shall be free of all visible residues and the remainder shall be limited to the light discoloration, slight staining or light residues mentioned above.*[2]

2. It is suggested that visual comparison of the surface area with Pictorial Surface Preparation Standards, Grade Sa 2, of Steel Structures Painting Council Visual Standard (SSPC-Vis 1) be used as a guide for determining the amount of blasting necessary to meet this requirement." (Emphasis added.)

Method A requires, with an exception, the complete removal of old paint. The exception permits the retention of only light discolorations, slight staining or light residues. Even this exception is limited to the retention of such residues on only one-third of every square inch to be cleaned. Thus, the contractual provisions do not provide for the retention of any significant areas of old paint.

Security suggests that we look to the two footnotes applicable to the Method A requirement in Form 409 in order to aid us in our interpretation of the contract. In note 1 we are referred to the "Steel Structures Painting Council Surface Preparation Specification: No. 6 Commerical Blast Cleaning (SSPC-SP6)" for "a *partial* description of *some of the various* blast cleaning methods which *may be used* to accomplish the requirements" of the contract. (Emphasis added.) Surely this discretionary and broad language does not alter the clear provisions found in Form 409. It is well established that "[w]hen a written contract is clear and unequivocal, its meaning must be determined by its contents alone. It speaks for itself and a meaning cannot be given to it other than that expressed. Where the intention of the parties is clear, there is no need to resort to extrinsic aids or evidence." *East Crossroads Center, Inc. v. Mellon-Stuart Company,* 416 Pa. 229, 230-31, 205 A. 2d 865, 866 (1965). The foregoing discussion is equally relevant to the second footnote applicable to the Method A requirement in Form 409, and we will not extend this opinion by repeating our analysis. The Board found only that Security was required to, and in fact did, remove the sound and adherent paint from the structures. We must conclude that, in doing so, Security merely met the correct contractual specifications and did not perform any extra work not otherwise contemplated by the contract.

Additionally, we note the seventh paragraph of the contract wherein it is provided:

"7. It is distinctly understood and agreed that no claim for extra work or material, not specifically herein provided, done or furnished by the contractor, will be allowed by the Secretary of Transportation, nor shall the contractor do any work or furnish any material not covered by the specification and the contract, unless such work is ordered in writing by the chief

highway engineer. In no event shall the contractor incur any liability by reason of any verbal directions or instructions that he may be given by said chief highway engineer or his authorized assistant, nor will said party of the first part be liable for any material furnished or used or for any work or labor done, unless said material, work or labor are required of said contractor on written order furnished by said chief highway engineer. Any such work or material which may be done or furnished by the contractor without such written order first being given shall be at said contractor's risk, cost and expense and he hereby covenants and agrees that without such written order he shall make no claim for compensation for work or material so done or furnished."

Even if Security's interpretation of the contractual specifications was correct, any misrepresentations by the PennDOT officials on the jobsite could not have formed the basis for the recovery sought here because Security failed to secure preliminarily the required written work order from the chief highway engineer. *Accord, Department of Transportation v. Mitchell's Structural Steel Painting Co.,* 18 Pa. Commonwealth Ct. 591, 336 A. 2d 913 (1975).

One contracting with the Commonwealth often does so at great risk. Before submitting his bid, a contractor should become aware of all contractual provisions and their ramifications. A failure to do so is often a prelude to disappointment or financial loss.

### ORDER

AND NOW, this 17th day of May, 1976, the order of the Board of Arbitration of Claims, dated September 17, 1975, awarding Security Painting Company damages in the amount of $30,255.45, is hereby reversed.